UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
MOHAMMAD SATTAR,                          :

                                          :
                      Plaintiff,          :        OPINION AND ORDER
                                          :
          -v.-                            :        12 Civ. 7828 (GWG)
                                          :
JEH JOHNSON,[1]                           :

                 Defendant.               :
-------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Mohammad Sattar brings this action pursuant to Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §§ 2000e to e-17 ("Title VII") and the Age Discrimination in

Employment Act of 1967, 29 U.S.C. §§ 621-34 ("ADEA"), alleging that defendant Jeh Johnson,

in his capacity as the Secretary of Homeland Security and by through the United States

Immigration and Customs Enforcement (the "Government"), discriminated against him on the

basis of his age, national origin, religion, and gender.  Sattar claims he was not selected for a

promotion, was subjected to a hostile work environment, and experienced retaliation as a result

of bringing complaints about the alleged discrimination.  The parties have consented to a United

States Magistrate Judge presiding over this case under 28 U.S.C. § 636(c).  The Government has

---

[1]  The original caption of this case named Janet Napolitano as the defendant, in her
official capacity as Secretary of Homeland Security.  Since this case was filed, Jeh Johnson
became the Secretary of Homeland Security.  Jeh Johnson is therefore automatically substituted
in as the defendant in this suit.  See Fed. R. Civ. P. 25(d).  The Clerk is requested to so amend
the caption.

moved for summary judgment.[2]  For the reasons given below, the Government's motion is granted.

I.      BACKGROUND

       A.      Facts

       Unless otherwise noted, the following facts are either undisputed or reflect Sattar's version of the facts as supported by admissible evidence.

       Sattar is a 72-year-old Muslim man who is originally from Bangladesh.  See Deposition of Mohammad Sattar held September 22, 2014, annexed in part as Ex. A to Folch Decl. ("Gov't Sattar Dep.") and in part as Ex. 1 to Gastman Decl. ("Pl. Sattar Dep."), at 31; Gov't 56.1 Stmt. ¶ A.1; Pl. 56.1 Stmt. ¶ A.1.  He earned a Bachelor of Science degree from Dhaka University in Bangladesh.  See id. at 38-39.  He also attended LaGuardia Community College and Queens College, earning 166 credits, though he did not graduate.  See id.; Resume of Mohammed Sattar, annexed as Ex. G to Folch Decl. ("Sattar Resume"), at US_00131.  He completed six credits in

---

       [2]  See Notice of Motion, filed Jan. 20, 2015 (Docket # 38); Declaration of Mónica P. Folch in Support of Defendant's Motion for Summary Judgment, filed Jan. 20, 2015 (Docket # 39) ("Folch Decl."); Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment, filed Jan. 20, 2015 (Docket # 40) ("Gov't Mem."); Defendant's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, filed Jan. 20, 2015 (annexed to Docket # 41 as Docket # 41-1) ("Gov't 56.1 Stmt."); Notice of Motion, filed Jan. 21, 2015 (Docket # 42) (defendant's corrected motion for summary judgment); Declaration of Alexander L. Gastman in Opposition to Defendants' Motion for Summary Judgment, filed Mar. 10, 2015 (Docket # 45) ("Gastman Decl."); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed Mar. 10, 2015 (Docket # 46) ("Pl. Mem."); Plaintiff's Local Rule 56.1 Counter-Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment, filed Mar. 11, 2015 (Docket # 48) ("Pl. 56.1 Stmt."); Defendant's Reply Memorandum of Law in Further Support of the Motion for Summary Judgment, filed Mar. 31, 2015 (Docket # 49); Declaration of Mónica P. Folch in Further Support of Defendant's Motion for Summary Judgment, filed Mar. 31, 2015 (Docket # 50) ("Second Folch Decl.").

accounting and nine in economics as electives, but his concentration was in computer science and statistics.  Pl. Sattar Dep. at 39; see also Sattar Resume at US_00131.

Sattar began working for the Immigration and Naturalization Service, whose successor agency is now part of the Department of Homeland Security ("DHS"), in 1981 as a part-time language interpreter and translator.  See Pl. Sattar Dep. at 43-44; Gov't 56.1 Stmt. ¶ A.4; Pl. 56.1 Stmt. ¶ A.4.  At some point, he left that position to work for the FBI.  See Pl. Sattar Dep. at 44. In March of 1989, he began working in the Federal Protective Service ("FPS") as a full-time GS-5 Control Room Operator.  See id. at 46-47; Gov't 56.1 Stmt. ¶ A.5; Pl. 56.1 Stmt. ¶ A.5. FPS is a branch of DHS, providing security at federal facilities.  See Deposition of Martin McRimmon held September 9, 2014, annexed in part as Ex. B to Folch Decl. ("Gov't McRimmon Dep.") and in part as Ex. 2 to Gastman Decl. ("Pl. McRimmon Dep."), at 31.

In 1993, Sattar was involuntarily transferred to a procurement position within FPS.  See Pl. Sattar Dep. at 53-54; Gov't Sattar Dep. at 63.  He believed this transfer was due to the fact that his name indicated that he was Muslim, and some higher-ups in the organization were "touchy" about having a Muslim working in the control room.  Pl. Sattar Dep. at 54-55.  This belief was based on a conversation shortly after this transfer, in which John Ulianko, a regional director who supervised Sattar's group at FPS, see November 7, 2014 Deposition of John Ulianko, annexed in part as Ex. 4 to Gastman Decl. ("Ulianko Dep."), at 25-26, 171; Pl. Sattar Dep. at 56, asked Sattar: "Are those terrorists your cousins?" in reference to recent terrorist attacks, see id. at 54-55, 80; Pl. 56.1 Stmt. ¶¶ A.6.a; 100-01.  Additionally, Sattar had once told Ulianko that "I am an Ahmadiyya Muslim," and Ulianko replied, "[a]fter all, you're a Muslim." Pl. Sattar Dep. at 78.  However, Ulianko did not have anything to do with the transfer.  See id. at 80.  At some point, Ulianko discovered that Sattar had been going into the men's room, kneeling

3

down in a stall, and praying.  See Am. Compl. ¶ 60; Affidavit of John A. Ulianko, dated Nov.

10, 2005, annexed as Ex. 10 to Gastman Decl. ("Ulianko Aff."), at Plaintiff002077.  On

September 12, 1997, Sattar's then-supervisor, John Natale, made a gesture in which he pretended

to shoot Sattar with an imaginary rifle, making a "bang" sound.  See Pl. Sattar Dep. at 75;

Affidavit of John Walter Natale, dated June 24, 1998, annexed as Ex. 8 to Gastman Decl., at 2.

In 1995, Sattar was promoted to a position as a GS-7 Program Technician, where his

duties included ordering supplies, approving orders, completing invoices, making payments, and

keeping records of transactions.  See Pl. Sattar Dep. at 68; Ulianko Aff. at Plaintiff002077; Pl.

56.1 Stmt. ¶¶ A.8.a, 102.  According to Ulianko, this is "a dead end position."  Ulianko Aff. at

Plaintiff002077.  Indeed, this was the last promotion Sattar received, though he applied for

others.  See Pl. Sattar Dep. at 7, 242.  At some unspecified time after 1995, his title changed to

Mission Support Assistant.  See Pl. Sattar Dep. at 80; see also September 12, 2014 Deposition of

Miankanze Bamba, annexed in part as Ex. D to Folch Decl. ("Gov't Bamba Dep.") and in part as

Ex. 3 to Gastman Decl. ("Pl. Bamba Dep."), at 40 (Sattar's position is listed as "Procurement

Technician," but it should be "Mission Support Specialist").  However, the only difference

between the Program Technician and Mission Support positions was their titles.  See Pl.

McRimmon Dep. at 46-47.  Sattar has been in either of these two positions, at the same pay

grade, since 1995.  See Pl. Sattar Dep. at 7; Pl. McRimmon Dep. at 47.  His current job duties

include paying bills normally up to $30,000, "P card" purchasing, working with "miscellaneous

. . . [and] recurring obligations," doing "reconciliations and closeouts," and making direct

payments to vendors.  Pl. Bamba Dep. at 42, 47-48; see Pl. Sattar Dep. at 12-13.  He had also

"obligated" some transactions at the million-dollar level.  Pl. Bamba Dep. at 42.  Some of the

budget and financial work that Sattar does, and has been doing for years, is the same as that done

4

by a Budget Analyst.  See id. at 46-48; Affidavit of Patricia Waskiewicz, annexed as Ex. 12 to

Gastman Decl. ("Waskiewicz Aff."), at US_00096.  However, his work is on a smaller dollar

scale, involving fewer lines of transactions.  See Pl. Bamba Dep. at 49.

Since he has worked for FPS, Sattar has filed several equal employment opportunity

("EEO") complaints.  See Pl. 56.1 Stmt ¶¶ C.64-70; Gov't 56.1 Stmt. ¶¶ C.64-70; Pl. Mem. at

24; Am. Compl. ¶ 63.  For example, on October 28, 1997, Sattar filed a complaint alleging that

he was discriminated against based on his race, national origin, religion, and age in connection

with his non-selection for a Contract Specialist position.  See Formal Complaint of

Discrimination, annexed as Ex. 9 to Gastman Decl. at Plaintiff001554-55.  On May 11, 2005,

Sattar filed an EEO complaint alleging that he had been discriminated against and denied

promotions at FPS on the basis of his religion and national origin.  See Complaint of

Discrimination, attached to Report of Investigation annexed as Ex. O to Folch Decl., at

Plaintiff002018.  On March 3, 2006, he amended that complaint to include claims of "ongoing

racial and religious discrimination."  Amendment to Complaint, annexed as Ex. P to Folch Decl.,

at Plaintiff002514.  The amendment included allegations that Ulianko discovered Sattar had

been going into the men's room, kneeling down in a stall, and praying and that Sattar was

subsequently placed in a "dead end position"; that emails critical of Muslims had been circulated

around the FPS office; and that a manager crept up behind Sattar and shouted "bang."  See id. at

Plaintiff002514-16.

All of these claims were resolved by an EEOC settlement agreement that Sattar entered

into with DHS.  See Settlement Agreement, dated Mar. 21, 2006, annexed as Ex. Q to Folch

Decl. ("Settlement Agreement").  Pursuant to that settlement agreement, the subject matter of the

2005 complaint was not to "be made the subject of future litigation."  Id. at US_00419.  DHS

agreed to provide Sattar with five training courses during official time, id., but they did not give him time off from work to complete those courses, and Sattar ultimately used three weeks of annual leave to complete one of the courses, see Pl. Sattar Dep. at 316.  At some point in 2004 and again in 2006, Ulianko asked Sattar why he went to EEO with these complaints, instead of bringing them to Ulianko.  See id. at 186.  At some unspecified times in 2004 and 2006, Ulianko told Sattar, "You're too old."  Id. at 186; Gov't Sattar Dep. at 347-48.  On December 24, 2008, an individual named Denis McGowan emailed Ulianko, with a "cc" to McRimmon, saying that Sattar had approached him and asked why he was being denied a promotion and alleged that he had been unfairly treated.  See Ex. 11 to Gastman Decl.  McGowan wrote that, in this conversation, Sattar mentioned "go[ing] to EEO" and engaged in "other veiled saber rattling," and he concluded the email with a warning that Sattar was "starting in again."  Id.

Some time in 2009, DHS announced a vacancy for a Budget Analyst position by posting Vacancy Announcement Number LAG-FPS-278253-SR-372-0562.  Pl. 56.1 Stmt. ¶ B.11; Gov't 56.1 Stmt ¶ B.11; Am. Compl. ¶ 35; see Ex. H to Folch Decl. ("Vacancy Announcement").  It stated that a Budget Analyst would be required to "perform a variety of administrative and analytical duties connected with the formulation, justification, presentation and evaluation of the agency budget."  Vacancy Announcement at US_00116.  This was a "journeyman grade" position, meaning that the person selected would be promoted from level GS-9 to GS-11 to GS-12 over the course of three years, provided the person's performance was satisfactory.  See Gov't Sattar Dep. at 95-96.

Sattar applied for the Budget Analyst position in September 2009.  See id. at 96-97; Gov't 56.1 Stmt. ¶ B.14; Pl. 56.1 Stmt. ¶ B.14; see also Sattar Resume (USAJOBS Career Center

employer view of Sattar's resume, date-stamped September 4, 2009).  At the time of his

application, Sattar was at the GS-7 level.  Sattar Resume at US_00130; Gov't Sattar Dep. at 96.

 Viola Smith, an African-American Baptist woman who was approximately 59 years old,

also applied for the Budget Analyst position.  See September 17, 2014 Deposition of Viola

Smith, annexed in part as Ex. C to Folch Decl. ("Gov't Smith Dep."), and in part as Ex. 7 to

Gastman Decl. ("Pl. Smith Decl."), at 81-82; Pl. 56.1 Stmt. ¶ B.15; Gov't 56.1 Stmt. ¶ B.15.  At

the time of her application, Smith was a GS-7 level employee with the title of Budget Analyst in

Immigration and Customs Enforcement ("ICE").  See Resume of Viola Smith, annexed as Ex. I

to Folch Decl. ("Smith Resume"), at US_00134; Pl. 56.1 Stmt. ¶ B.16; Gov't 56.1 Stmt. ¶ B.16.

She had held that position since August 2007, during which time she performed the duties of a

Budget Analyst.[3]  See Smith Resume at US_00134; Gov't Smith Dep. at 107; Gov't McRimmon

Dep. at 168.  Prior to August 2007, she worked as a Detention and Removal Assistant at ICE,

where she purchased and monitored inventory, among other tasks.  Smith Resume at US_00134.

Prior to that, from April 2005 to March 2007, Smith held the position of Procurement Technician

--------

[3]  The parties seem to dispute how long Smith had been performing the duties of that
position and at which level.  The Government contends that she held it and performed its duties
since August 2007, see Gov't 56.1 Stmt. ¶¶ B.16-17, while Sattar notes that Smith was
incorrectly promoted from a GS-7 level Budget Analyst position to the GS-9 level in August
2008, and again promoted to the GS-11 level in August 2009, see Pl. 56.1 Stmt. ¶¶ B.16.a-17.a,
125-29 (citing Ex. 5 to Gastman Decl. (emails from October 2009 among Smith, Ulianko, and
Human Resources Specialist Susan Rathwick, discussing this error)).  The evidence cited by
Sattar indicates that the proper level for Smith's position since August 2007 was GS-7 and that
her subsequent erroneous promotions to GS-9 and GS-11 were cancelled and the overpayments
in salary were repaid.  See Ex. 5 to Gastman Decl. at US_01408; Ulianko Dep. at 82.  The
evidence cited by Sattar does not indicate that Smith's initial non-competitive reassignment into
a Budget Analyst position in August 2007 was in error, however.  We therefore assume that
Smith's correct level since August 2007 was GS-7, and that she had been performing the duties
of a Budget Analyst since then.

(Contractor) for FPS, requiring her to review, analyze, and investigate applications for suitability and government security clearances.  See id. at US_00135.  She had also worked in the private sector.  From 1973 to 1987, she was a Supervisor/Senior Wholesale Inventory Control Specialist at JC Penny Co.; and from 1987 to 2004, she was a Material Planner/Production Scheduler at Lever Brothers/Unilever HPC, NA.  Id.  In those jobs, she had created a $2 million budget, developed master production schedules for three manufacturing facilities, and developed $650 million merchandise commitment plans.  Id.  Smith attended Baruch College and York College.  See Gov't Smith Dep. at 18; Smith Resume at US_00136.  She did not graduate, but she earned approximately 24 credits in accounting.  See Gov't Smith Dep. at 18; Smith Resume at US_00136.

A third individual, Susan Fitzgerald, also applied for the Budget Analyst position.  See Gov't 56.1 Stmt. ¶ B.22; Pl. 56.1 Stmt. ¶ B.22.  At the time of her application, she was working as a GS-7 level Accounting Technician at ICE's Finance Center in Williston, Vermont.  See Resume of Susan Fitzgerald, annexed as Ex. J to Folch Decl., at US_00661.  In that position, she created bills, distributed invoices, and reconciled government accounts, among other duties.  See id.  Before that, she had worked in the private sector, most recently as an Accounting Assistant for HSBC, where she reconciled accounts, investigated accounting discrepancies, and assisted in budget preparations.  See id.  Fitzgerald received an Associate's Degree from Champlain College, with a major in business and a minor in accounting.  See id. at US_00662.

The Budget Analyst position was announced according to the agency's merit promotion procedures.  See Vacancy Announcement at US_00117.  Those procedures required applicants to electronically submit a resume and responses to a series of job-related questions to the U.S. Customs and Border Protection Human Resources Management ("HRM").  See id.; U.S.

8

Customs and Border Protection Tri-Bureau Merit Promotion Plan, annexed as Ex. K to Folch Decl. ("Promotion Plan"), at US_00165, US_00168-69.  Each applicant was assigned a score up to 100 points, reflecting the applicant's education, training, and experience for the position.  See Vacancy Announcement at US_00117; Promotion Plan at US_00170.  The minimum qualifying score was 70.  Promotion Plan at US_00170.  The pool of applicants was then evaluated, and a list of the "best qualified" candidates was selected.  See Vacancy Announcement at US_00117; Promotion Plan at US_00169-72.  This was done by officials within HRM, not by FPS managers.  See Promotion Plan at US_00171; Gov't McRimmon Dep. at 76; Gov't Sattar Dep. at 169-70; see also U.S. Immigration and Customs Enforcement (ICE) Hiring and Onboarding Handbook, annexed as Ex. M to Folch Decl. ("Hiring Handbook"), at US_01615.  Under agency procedures, the applicants' resumes and their interview scores — and only those two factors — determine who is selected for a position.  See Ulianko Dep. at 113-15.

Here, the "best qualified" list consisted of three applicants: Sattar, Smith, and Fitzgerald.  See Gov't 56.1 Stmt. ¶ B.33; Pl. 56.1 Stmt. ¶ B.33.a.  That list was sent to McRimmon, who was the "selecting official" authorized to select the applicant to fill the Budget Analyst position from the "best qualified" list.  See Merit Promotion Certificate of Eligibles, annexed as Ex. L to Folch Decl., at US_00163; Promotion Plan at US_00171; Hiring Handbook at US_01615.  According to the merit promotion procedures, McRimmon could opt to interview applicants from the "best qualified" list, and he was ultimately authorized to "choose any applicant referred on the best-qualified list" to fill the position.  Promotion Plan at US_00171.

Each of the three applicants from the "best qualified" list was interviewed by a three-member panel.  See Gov't Sattar Dep. at 112; Pl. Bamba Dep. at 61; see also Consensus Rating Forms, annexed as Ex. N to Folch Decl. at US_00138-43 ("Consensus Rating Forms").  The

panel consisted of Martin McRimmon, a mission support chief with FPS and a first-line supervisor for the region, Pl. Bamba Dep. at 44-45; Gov't McRimmon Dep. at 28-29; Miankanze Bamba, a supervisor in the budget and finance areas of FPS who supervised Sattar and Smith and was the panel's subject matter expert, see Pl. Bamba Dep. at 34, 63; and Raymond Gauvin, a regional manager who was familiar with the operational side of FPS, see Gov't McRimmon Dep. at 82. See generally Consensus Rating Forms. Although the applicants were interviewed by the entire panel, McRimmon was responsible for making the final decision as to who would be hired to fill the position. See Gov't McRimmon Dep. at 96; Ulianko Dep. at 66. Sattar and Fitzgerald's interviews were held on October 26, 2009, and Smith's interview was held on November 2, 2009.[4]  See Consensus Rating Forms at US_00138, US_00140, US_00142.

During the interview, each candidate was asked the same questions. Gov't McRimmon Dep. at 96-97. Those questions were based on sample questions, which Bamba "rephrase[d]" into new questions. Pl. Bamba Dep. at 58-59. Bamba did not review those questions with the other panel members prior to conducting the interviews. See id. at 59. McRimmon did not allow Smith enough time to answer some questions, causing Bamba to interrupt him to allow her time to respond. See id. at 72-73. However, each applicant ultimately had "ample time" to answer the panel's questions. Affidavit of Raymond Gauvin, dated July 21, 2010, annexed as Ex. 13 to Gastman Decl., at US_00075. As the interviews were conducted, each panel member scored the applicants' answers to each question on a scale from zero to five. See Gov't McRimmon Dep. at 98-99; Consensus Rating Forms. After each interview, the panel members

---

[4]  All of the applicants were initially scheduled to interview on the same day, but Smith ultimately interviewed a week later than the other two. See Pl. Bamba Dep. at 61; Pl. McRimmon Dep. at 102; Pl. Smith Dep. at 87; Consensus Rating Forms at US_00138, US_00140, US_00142.

discussed the candidate and his or her answers to each question, and the panel arrived at

consensus scores for each applicant.  Gov't McRimmon Dep. at 98-99; Gov't Bamba Dep. at 75-

76; May 1, 2012 Deposition of Raymond Gauvin, annexed in part as Ex. F to Folch Decl.

("Gauvin Dep."), at 25.  If panel members had scored an applicant differently, they reached this

consensus by discussing the question posed and the applicant's answer until at least two of the

panel members agreed on a score.  See Gov't Bamba Dep. at 75-76.  The consensus scores were

recorded on score sheets, which were signed by each panel member.  See Consensus Rating

Forms.  Smith and Fitzgerald both received consensus scores of 56.  See Letter from Miankanze

Bamba, dated June 28, 2010, annexed as Ex. N-1 to Folch Decl. ("Bamba Ltr."), at US_00150;

Consensus Rating Forms, attached to Bamba Ltr. ("Bamba Consensus Rating Forms"), at

US_00155-58.[5]  Sattar received a consensus score of 33.  See Consensus Rating Forms at

US_00142-43; Bamba Consensus Rating Forms at US_00153-154.

     Ultimately, McRimmon selected Smith for the Budget Analyst position.[6]  See Gov't

McRimmon Dep. at 219.  Bamba disagreed with this decision, however, and on June 28, 2010 —

---

     [5] Sattar cites to Bamba's Consensus Rating Forms, on which he recorded each candidate's consensus score in addition to the score Bamba assigned them individually.  See Pl. 56.1 Stmt. ¶ B.52.a.  Those forms indicate that Smith and Fitzgerald both received consensus scores of 56.  See Bamba Consensus Rating Forms at US_00154, US_00156, US_00158.  The Consensus Rating Forms that were ultimately submitted by McRimmon, however, indicate that Fitzgerald received a consensus score of 56, and Smith received a consensus score of 58.  See Consensus Rating Forms at US_00137-41.  We accept Sattar's version of the consensus scoring for the purposes of this opinion.

     [6] After Smith was selected, McRimmon emailed the interview score sheets to an individual named Danny Young.  See Ex. 15 to Gastman Decl.  An email exchange between the two indicates that McRimmon was not aware that he needed to score the applicants' resumes as well as their interviews, and there was also some confusion as to how many individuals were being selected for positions.  See id. at US_00831.  The matter was apparently discussed in a phone call between McRimmon and Young.  See id. at US_00835.

several months after the interviews were conducted — he sent a letter to Kayona M. Dade, Employee Relations Specialist for DHS, noting his disagreement.  See Bamba Ltr. at US_00150. Bamba attached his own score sheets to the letter, indicating that his scores for the candidates were as follows: Fitzgerald, 59; Sattar, 52; and Smith, 44.  See Bamba Consensus Forms at US_00153-58.  Bamba believed that none of the candidates' consensus scores were high enough for them to be selected for the position and that the selection process had been "much influenced by favoritism."  Bamba Ltr. at US_00150.  He stated that, based on the one round of interviews conducted, he would have selected Fitzgerald for the Budget Analyst position but that, ideally, additional rounds of interviews would have been conducted or the process would have been restarted.  See Gov't Bamba Dep. at 92-93; see also Bamba Consensus Rating Forms at US_00153-58.  He testified at his deposition following the filing of this lawsuit that both Smith and Sattar were qualified for the position, but that Sattar was more qualified based on his performance in the interview.  Pl. Bamba Dep. at 90-91.  He opined that Sattar would not have needed additional training in the Budget Analyst position because he was already "an expert in the area," while Smith required constant help to learn that position.  Id. at 92.

On November 23, 2009, shortly after the interviews for the Budget Analyst position were conducted, Ulianko said to Sattar, "Mohammad [Sattar] will not be promoted to 9, 11, 12, Mohammad will mess up."  Pl. Sattar Dep. at 153.  At another unspecified time, Ulianko stated that "[s]o long [as] I'm on the job, Mohammad will not be promoted."  Id. at 159.

In an affidavit dated August 9, 2010, Patricia Waskiewicz, who was Sattar and Smith's supervisor prior to her retirement in 2006, stated that she believed that Sattar was qualified for the Budget Analyst position.  See Waskiewicz Aff. at US_00092, US_00095, US_00098,

US_00100.[7]  Waskiewicz also stated that there was "a pattern of unusual hiring and promotion

practices" in this particular FPS region, "especially for employees that they like and do not like."

Id. at US_00096.  She further stated that she could "recall many examples of comments made

about [Sattar's] religion and age" when Sattar was not present.  Id. at US_00097-98.

Sattar filed an EEO complaint of discrimination based on his non-selection for the

Budget Analyst position on March 11, 2010, see Individual Complaint of Employment

Discrimination, annexed as Ex. R to Folch Decl., at US_00015; Pl. 56.1 Stmt. ¶ C.70; Gov't 56.1

Stmt. ¶ C.70, and he filed the complaint in the instant action on October 19, 2012, see

Complaint, filed Oct. 19, 2012 (Docket # 1).[8]

In January 2012, Sattar emailed McRimmon to request that he be allowed to perform all

of his work from home (that is, to "telework") due to a medical condition.  See Ex. X to Folch

Decl.; Pl. 56.1 Stmt. ¶ D.86; Gov't 56.1 Stmt. ¶ D.86.  McRimmon initially denied that request,

see Gov't McRimmon Dep. at 184-85, though FPS did have a telework policy at the time, see Pl.

Bamba Dep. at 102-03; see also Ulianko Dep. at 25-26, 125-26.  Sattar subsequently brought the

request to DHS's "disability section," which recommended that the request be granted.  Gov't

McRimmon Dep. at 185; Gov't Sattar Dep. at 299-300.  McRimmon then approved the request.

---

[7]  Waskiewicz also offers an account of how the Budget Analyst position was filled, but
the account is based on hearsay rather than her personal knowledge, see id. at US_00095-96, and
therefore cannot be considered on this summary judgment motion, see Fed. R. Civ. P.
56(c)(1)(4).

[8]  Sattar asserts that, on two occasions shortly before he brought the EEO complaint,
McRimmon called Sattar into his office and threatened or attempted to intimidate him about his
EEO activity.  See Pl. 56.1 Stmt. ¶¶ 169-70; Pl. Mem. at 27.  We do not consider this assertion,
however, because the only evidence cited to support it is Sattar's responses to the Government's
interrogatory number 1, which were signed by Sattar's attorney but was not sworn under oath as
required by Fed. R. Civ. P. 33(b)(3).  This evidence is therefore inadmissible.  See, e.g., Miroglio
S.P.A. v. Conway Stores, Inc., 2008 WL 4600984, at *6 (S.D.N.Y. Oct. 15, 2008).

See Gov't McRimmon Dep. at 184-85.  Approximately one year later, a representative of the

DHS Disability Employment Program requested updated medical information regarding Sattar's

continued need for a full-time telework arrangement.  See Ex. Y to Folch Decl., at

Plaintiff000012.  That representative eventually recommended that Sattar continue to be allowed

to telework, see id. at Plaintiff 000010, and McRimmon adopted that recommendation, see id. at

Plaintiff000008.

　　　　While Sattar asserts that, in 2012, McRimmon lowered his performance grade, thereby

reducing his year-end monetary award, see Am. Compl. ¶ 66; Pl. Mem. at 7, 25-27, Sattar offers

no admissible evidence to support this contention.[9]

　　　　In 2013, Sattar requested overtime compensation for five hours he had worked on a

Sunday.  See Gov't Sattar Dep. at 307; Letter from Denis McGowan, FPS Regional Director,

dated May 28, 2013, annexed as Ex. V to Folch Decl. ("McGowan Ltr.")  He made no written

request beforehand, however.  See Gov't Sattar Dep. at 307-10; see also Gov't McRimmon Dep.

at 196-97.  It was FPS policy that employees must seek written approval to work overtime before

performing that work, see Gov't Sattar Dep. at 211; Gov't McRimmon Dep. at 200; McGowan

Ltr., although overtime was sometimes approved after the fact if the request was justified, see Pl.

Bamba Dep. at 116.  Indeed, McRimmon had previously approved some after-the-fact overtime

---

　　　　[9]　Sattar cites to the Government's Local Rule 56.1 statement, which only acknowledges
that Sattar made this allegation in his complaint and that he received year-end monetary awards
for the two years immediately following the 2010 EEO complaint, see Pl. Mem. at 7 (citing
Gov't 56.1 Stmt. ¶ 84); Pl. 56.1 Stmt. ¶¶ 178-79 (citing Gov't 56.1 Stmt. ¶ 82), and to
paragraphs of his own Local Rule 56.1 statement that do not support the claim, see Pl. Mem. at
7, 27 (citing Pl. 56.1 Stmt. ¶¶ 176-77).  While a sworn complaint is treated as an affidavit in
support of a motion for summary judgment if it meets the other requirements of Fed. R. Civ. P.
56 for affidavits, see Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995), neither the original
complaint nor the amended complaint in this case was sworn.

requests from Sattar.  See Pl. McRimmon Dep. at 200.  In this instance, however, McRimmon

denied Sattar's overtime request on the ground that Sattar had not requested it in advance.  See

id. at 196-97.  Sattar lodged a grievance with his union seeking payment for the five hours, see

Pl. Sattar Dep. at 308; McGowan Ltr., and he was ultimately compensated for the overtime, see

Gov't McRimmon Dep. at 196; Pl. 56.1 Stmt. ¶ 184.

McRimmon sometimes excluded Sattar from meetings when the subject of those

meetings would be of less concern to Sattar or when McRimmon wanted to keep the number of

attendees low.  See Pl. Bamba Dep. at 104-05; Pl. McRimmon Dep. at 202.  On May 15, 2013,

McRimmon emailed Bamba, Smith, and three other individuals to inform them about a meeting

the next day.  See Ex. 16 to Gastman Decl. at Plaintiff000016.  Sattar was not included on this

email.  See id.  Though Bamba asked McRimmon to include Sattar in the meeting, Sattar

apparently was not included.  See id. at Plaintiff000015-16.

No males or persons over the age of 60 have been hired in Sattar's group at FPS.  See

Ulianko Dep. at 172-74.  Since Smith began working at FPS, no males in the "budget and

finance" group have been promoted.  See Pl. Smith Dep. at 124.   Bamba testified that since he

began working at FPS in 2008, no males, Muslims, or persons over the age of 60 have been

promoted competitively (presumably referring to Bamba's group).  See Gov't Bamba Dep. at 23;

Pl. Bamba Dep. at 113.

B.     Procedural History

On March 11, 2010, Sattar filed an EEO complaint, claiming that he was not selected for

the Budget Analyst position because of discrimination based on his religion, national origin,

gender, age, and "past EEO activities."  Individual Complaint of Employment Discrimination,

annexed as Ex. R to Folch Decl., at US_00015, US_00018.  An Administrative Law Judge

("ALJ") dismissed the complaint on summary judgment on July 11, 2012, finding that Sattar had not shown illegal discrimination on any of these bases with respect to his non-selection for the Budget Analyst position.  See Memorandum Decision on Summary Judgment, annexed as Ex. S to Folch Decl.  DHS issued a final order implementing the ALJ's decision on July 27, 2012.  See Final Order, annexed as Ex. T to Folch Decl.

Sattar filed this suit on October 19, 2012, see Complaint, filed Oct. 19, 2012 (Docket # 1), and filed an amended complaint on February 21, 2013, see Amended Complaint, filed Feb. 21, 2013 (Docket # 7).  He raises claims of age discrimination under the ADEA, and of discrimination based on his national origin, religion, and gender under Title VII.  See Amended Complaint ¶¶ 1, 3, 6.  Specifically, he alleges that DHS discriminated against him by not selecting him for the Budget Analyst position, subjecting him to a hostile work environment, and retaliating against him for his prior EEO complaint.  See id. ¶¶ 65, 74, 80.

II.      LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Fed. R. Civ. P. 56(a) states that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed," and the court must draw "all justifiable inferences" in favor of the non-moving party.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must

16

come forward with 'specific facts showing that there is a genuine issue for trial,'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (emphasis and additional citation omitted) (quoting an earlier version of Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998) (citation omitted).  In other words, the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." <u>Anderson</u>, 477 U.S. at 256.  Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" <u>Nebraska v. Wyoming</u>, 507 U.S. 584, 590 (1993) (alteration in original) (quoting <u>Celotex</u>, 477 U.S. at 322).  Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." <u>Allen v. Cuomo</u>, 100 F.3d 253, 258 (2d Cir. 1996) (citing <u>Anderson</u>, 477 U.S. at 247-48).

III.    <u>DISCRIMINATION CLAIM BASED ON NON-SELECTION</u>

A.    <u>Governing Law</u>

ADEA and Title VII claims are analyzed "under the same framework."  <u>Schnabel v. Abramson</u>, 232 F.3d 83, 87 (2d Cir. 2000) (quoting <u>Woroski v. Nashua Corp.</u>, 31 F.3d 105, 108 (2d Cir. 1994)); <u>see</u> <u>Terry v. Ashcroft</u>, 336 F.3d 128, 138 (2d Cir. 2003); <u>Aneja v. M.A. Angeliades, Inc.</u>, 2008 WL 918704, at *5 (S.D.N.Y. Mar. 31, 2008) (citation omitted).  Under the framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), the plaintiff carries the initial burden of establishing a prima facie case of discrimination in cases alleging that the proffered reason for the employment action was a mere pretext for discrimination.  <u>See</u> <u>id.</u> at 802; <u>accord</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993); <u>Joseph v. Leavitt</u>, 465

F.3d 87, 90 (2d Cir. 2006) (quoting James v. N.Y. Racing Ass'n, 233 F.3d 149, 153-54 (2d Cir. 2000)).[10]   To establish a prima facie case of disparate treatment, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination.  See Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (citing McDonnell Douglas, 411 U.S. at 802).

If the plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action.  McDonnell Douglas, 411 U.S. at 802; see St. Mary's, 509 U.S. at 506-07; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-55 (1981); Joseph, 465 F.3d at 90; Evans-Gadsen v. Bernstein Litowitz Berger & Grossman, LLP, 491 F. Supp. 2d 386, 395 (S.D.N.Y. 2007), aff'd, 323 F. App'x 59 (2d Cir. 2009).  If the employer articulates such a reason for its action, the presumption of discrimination is eliminated, and "the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably

---

[10]  A different framework, set out in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (plurality opinion), applies in "mixed motive" or "dual issue motivation" cases.  E.g., Bickerstaff v. Vassar Coll., 196 F.3d 435, 445-46 (2d Cir. 1999).  We believe the allegations here indicate that this is a "single motive" case that fits in the McDonnell Douglas framework.  However, it is not necessary to reach this question because, in both instances and as is described further below, the court's ultimate task is to determine whether the plaintiff has presented "sufficient admissible evidence from which a rational finder of fact could infer that more likely than not she was the victim of intentional discrimination."  Id. at 447; see 42 U.S.C. § 2000e–2(m) ("An unlawful employment practice is established when the [plaintiff] demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice . . . .").  Accordingly, our analysis is conducted on the assumption that Sattar has made out a prima facie case as this assumption makes no difference to the outcome.  See, e.g., Jalal v. Columbia Univ. in the City of N.Y., 4 F. Supp. 2d 224, 234 (S.D.N.Y. 1998) ("Rather than dance mechanistically through the McDonnell Douglas and Price Waterhouse 'minuets,' . . . I will proceed directly to the ultimate issue.").

supports a finding of prohibited discrimination." James, 233 F.3d at 154 (citing cases). Such evidence may include, for example, a showing that "'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Patterson v. Cty. of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (quoting Burdine, 450 U.S. at 253). Importantly, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" St. Mary's, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253) (alteration in original); accord Schnabel, 232 F.3d at 90. Thus, it is not sufficient for the fact-finder to disbelieve the employer's explanation; rather, "'the fact-finder must believe the plaintiff's explanation of intentional discrimination.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (quoting St. Mary's, 509 U.S. at 519) (emphasis omitted). In other words, the plaintiff "must always prove that the conduct at issue . . . actually constituted discrimination." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (internal quotation marks, emphasis and alteration omitted).

Nevertheless, while the plaintiff must prove that the defendant's proffered reasons for termination were pretextual, the plaintiff is not always required to "introduce additional, independent evidence of discrimination." Reeves, 530 U.S. at 149. "In appropriate circumstances," the evidence of pretext alone will be sufficient to "infer . . . that the employer is dissembling to cover up a discriminatory purpose." Id. at 147; see also Schnabel, 232 F.3d at 90 ("Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'") (quoting Reeves, 530 U.S. at 143).

Despite the elaborate framework set up in McDonnell Douglas, Second Circuit case law

makes clear that the court may simply assume that the plaintiff has established a prima facie case

and skip to the final step in the <u>McDonnell Douglas</u> analysis, as long as the employer has

articulated a legitimate nondiscriminatory reason for the adverse employment action.  <u>See</u>, <u>e.g.</u>,

<u>Graves v. Finch Pruyn & Co.</u>, 457 F.3d 181, 187-88 (2d Cir. 2006) (declining to resolve a

dispute regarding the establishment of a prima facie case of age discrimination on the ground

that plaintiff had "not pointed to any record evidence to dispute [defendant's] legitimate reason

(so far as the ADEA is concerned) for the alleged adverse employment action"); <u>Roge v. NYP</u>

<u>Holdings, Inc.</u>, 257 F.3d 164, 168 (2d Cir. 2001) (declining to decide whether a prima facie case

was made out because defendant "met its burden to put forth legitimate, nondiscriminatory

reasons for [plaintiff's] termination, and [plaintiff] has failed as a matter of law to proffer

evidence of pretext sufficient to go to a trier of fact"); <u>see</u> <u>also</u> <u>Morris v. Ales Grp. USA, Inc.</u>,

2007 WL 1893729, at *7 (S.D.N.Y. June 29, 2007); <u>Mathews v. Huntington</u>, 499 F. Supp. 2d

258, 264 (E.D.N.Y. 2007); <u>Tomney v. Int'l Ctr. for the Disabled</u>, 357 F. Supp. 2d 721, 742

(S.D.N.Y. 2005).

  B. <u>Discussion</u>

  The Government has offered a legitimate, nondiscriminatory reason for failing to select

Sattar for the Budget Analyst position — specifically, that Sattar was not as well-qualified for

the position as Smith, who was selected.  <u>See</u> Gov't Mem. at 13 (citing Merit Promotion

Certificate of Eligibles, annexed as Ex. L to Folch Decl., at US_00162; Gov't McRimmon Dep.

at 218-19).  Therefore, we will turn to the question of whether Sattar has identified evidence that

would allow a reasonable jury to find that the failure to select him was motivated by

discrimination.

  Sattar asserts that the Government's stated reason for not selecting him for the Budget

Analyst position was a mere pretext to justify discrimination and that a question of fact remains as to whether Sattar's protected characteristics were a motivating factor in his non-selection.  See Pl. Mem. at 17-20.  The evidence he points to, however, does not support his claim.  Viewing the admissible evidence before us in the light most favorable to Sattar, the evidence consists of disparate and occasional questionable statements or actions by supervisors and possible favoritism within his department that cannot be connected to discrimination.

　　First, Sattar claims that he was more qualified for the Budget Analyst position than Smith.  See id. at 2, 17; Pl. 56.1 Stmt. ¶¶ 134-38.  "[A]n employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility" of the employer's stated reason for its employment decision.  Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) (citing cases).  However, courts "afford employers a great deal of discretion in assessing the credentials and qualifications of applicants and in determining the criteria for positions." Milano v. Astrue, 2008 WL 4410131, at *32 (S.D.N.Y. Sept. 26, 2008) (citing cases), aff'd, 382 F. App'x 4 (2d Cir. 2010).  For a discrepancy in qualifications to serve as a basis to defeat a motion for summary judgment, the plaintiff's "credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." Byrnie, 243 F.3d at 103; accord Cintron v. Orange Cnty. Cmty. Coll., 2013 WL 1812196, at *6 (S.D.N.Y. Apr. 29, 2013).  In other words, "[a] plaintiff may defeat summary judgment by showing that he was objectively so much better qualified than the person promoted over him that the employer's justification for the decision must be pretextual." Witkowich v. Gonzales, 541 F. Supp. 2d 572, 582 (S.D.N.Y. 2008) (citation omitted).

　　Sattar's evidence on this point rests largely on Bamba's opinion of the applicants.  See

Pl. Mem. at 17-18.  Bamba scored Sattar higher than Smith after the interviews, see Bamba

Consensus Rating Forms at US_00153-54, US_00157-58, and he indicated that Smith was not

the most qualified applicant for the position, see Pl. Bamba Dep. at 90-93.  But Bamba initially

believed that none of the applicants was qualified for the position.  See Bamba Ltr. at US_00150.

Moreover, the opinion of one interview panel member does not establish that "no reasonable

person," Byrnie, 243 F.3d at 103 (citation omitted), would have selected Smith over Sattar for

the position based on a comparison of their credentials.  The other two panel members scored

Smith higher than Sattar by consensus.  See Consensus Rating Forms at US_00140-43; Gov't

McRimmon Dep. at 98-99; Gov't Bamba Dep. at 75-76; Gauvin Dep. at 25.  And an examination

of Sattar's and Smith's qualifications does not show Sattar's credentials to be so objectively

superior that no reasonable person could have thought otherwise.  To the contrary, the two

candidates were evenly matched.  Indeed, an objective view would give Smith a slight edge.

Both had completed some relevant course work in college: Sattar completed six credits in

accounting and nine in economics, see Pl. Sattar Dep. at 39; Sattar Resume at US_00131, and

Smith completed approximately 24 credits in accounting, see Gov't Smith Dep. at 18; Smith

Resume at US_00136.  Smith had held the position of Budget Analyst since August 2007, and

had previously held other positions at FPS and in the private sector, see Smith Resume at

US_00134-35, while Sattar had never held that job title, see Sattar Resume at US_00130-31.

While Sattar's duties were similar to those of a Budget Analyst, they were on a smaller dollar

scale, involving fewer lines of transactions.  See Pl. Bamba Dep. at 48-49.  Smith had experience

creating a $2 million budget, developing master production schedules for three manufacturing

facilities, and developing $650 million merchandise commitment plans.  See Smith Resume at

US_00135.  Sattar had experience "obligating" transactions at the million-dollar level at most.

Pl. Bamba Dep. at 42.

Given their respective qualifications, we cannot find that Sattar was so much better qualified than Smith for the Budget Analyst position that a reasonable jury could find that the Government's reason for selecting Smith was pretextual.  To fault the Government for selecting Smith over Sattar would improperly require the factfinder to "act as a 'super personnel department,' second-guessing the merits of" the Government's decision to select Smith for the position over Sattar.  Witkowich, 541 F. Supp. 2d at 582 (quoting Meacham v. Knolls Atomic Power Lab., 461 F.3d 134, 144 (2d Cir. 2006), vacated on other grounds by 554 U.S. 84 (2008)).

Sattar points to evidence that, for a number of years, no males or Muslims in his group at FPS have been promoted, and no persons in his group at FPS over the age of 60 have been promoted or hired competitively.  See Pl. Mem. at 18 (citing Pl. 56.1 Stmt. ¶¶ 115-21).  This evidence does little to support Sattar's claim, however.  As an initial matter, the time periods in question are unspecified, see id.; Pl. 56.1 Stmt. ¶¶ 115-21, so it is difficult to gauge the meaning of these hiring decisions.  More importantly, because Sattar only offers evidence with respect to his group at FPS, there is little data to evaluate.  There were just six employees in this group at the time of Sattar's non-selection.  See September 9, 2014 Deposition of Martin McRimmon, annexed in part as Ex. AA to Second Folch Decl., at 33.  Such a small sample size does not allow for inferences of discrimination.  See Pollis v. New Sch. for Soc. Research, 132 F.3d 115, 121 (2d Cir. 1997) (citing cases and noting that "[t]he smaller the sample, the greater the likelihood that an observed pattern is attributable to other factors and accordingly the less persuasive the inference of discrimination to be drawn from it"); Haskell v. Kaman Corp., 743 F.2d 113, 121 (2d Cir. 1984) (10 terminations over an 11-year period was an insufficient sample size to support an inference of age discrimination); Aguirre v. N.Y. State Police, 156 F. Supp. 2d

305, 320-21 (S.D.N.Y 2001) (five incidents of alleged disparate treatment over seven years was an insufficient sample size to demonstrate a pattern of racial bias); see also Bickerstaff, 196 F.3d at 450 (no abuse of discretion where district court found plaintiff's statistical evidence, based on only herself as a sample, to be of no probative value).

Moreover, Sattar points to no evidence as to the age, sex, race, national origin and religion of the applicant pool for any of the positions he is referring to.  Without such information, it is impossible to determine if the selections for particular positions deviate from the rate of selection that would be expected if the personal characteristics of the applicants were not influencing the decisionmakers' selections.  See, e.g., Geller v. Markham, 635 F.2d 1027, 1033 (2d Cir. 1980) (evidence as to the relevant applicant pool is "essential to a statistical determination of hiring patterns"); Schupbach v. Shinseki, 905 F. Supp. 2d 422, 425 (E.D.N.Y. 2012) ("[T]he hiring statistics provided by plaintiff are rendered meaningless by the fact that plaintiff failed to present the race or color of the larger applicant pool from which the candidates for each position were selected."); Toliver v. Sullivan Diagnostic Treatment Ctr. (SDTC), 812 F. Supp. 411, 413 (S.D.N.Y. 1993) ("The small number of minority members hired . . . may or may not reflect the ethnic mix of the relevant applicant pool or the area involved; without such information, an inference of discrimination cannot be drawn.").  Under these circumstances, Sattar has not provided evidence that would allow a jury to find that his non-selection was motivated by discriminatory intent.

Sattar points to Waskiewicz's statement that his group at FPS had "unusual hiring and promotion practices, especially for employees that they like and do not like," Waskiewicz Aff. at US_00095-96, and Waskiewicz's claims of "a great deal of unequal employment treatment," id. Pl. Mem. at 18-19 (citing Pl. 56.1 Stmt. ¶¶ 122-23).  These statements, however, are conclusory

and therefore of little evidentiary value.  Also of little evidentiary value are statements from Ulianko suggesting that he did not think well of Sattar's performance or chances for promotion. See Pl. Sattar Dep. at 153 ("Mohammad will not be promoted to 9, 11, 12, Mohammad will mess up."); id. at 159 ("So long as I'm on the job, Mohammad will not be promoted.").  It is well established that "mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001); see Tappe v. Alliance Capital Mgmt. L.P., 177 F. Supp. 2d 176, 185 n.9 (S.D.N.Y. 2001) ("[A]n employer can fire an employee for any reason as long as the reason is non-discriminatory even if based on reasons that are 'unbecoming or small-minded, such as back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility.'") (quoting Fisher v. Vassar Coll., 114 F.3d 1332, 1337 (2d Cir. 1997) (en banc), abrogated on other grounds by Reeves, 530 U.S. 133)). Thus, if FPS supervisors preferred some employees to others based on the strength of their personal relationships, or if Ulianko did not want Sattar to get a promotion and anticipated that he would fail, or even if the selection process itself was skewed due to McRimmon's preference for Smith as Sattar suggests, see Gov't Sattar Dep. at 201, 205, 266-67, these claims do not show discrimination.  Sattar is not entitled to relief based on favoritism within FPS unless that favoritism occurred because of some protected characteristic.

There is evidence is that one or more FPS employees made comments about Sattar's religion and age.  See Waskiewicz Aff. At US_00097-98 (Waskiewicz witnessed comments made about Sattar's religion and age); Pl. Sattar Dep. at 186 (Ulianko twice said to Sattar, "You're too old"); id. at 54-55, 80 (shortly after Sattar's involuntary transfer in 1993, Ulianko

asked Sattar: "Are those terrorists your cousins?" in reference to recent terrorist attacks), id. at 78 (at some point, Ulianko said to Sattar, "[a]fter all, you're a Muslim").  However, there is no evidence of such comments being made by any individual involved with the selection process for the Budget Analyst position.  Thus, this evidence, by itself or in combination with the other evidence, would not be enough for a jury to conclude his non-selection was motivated by a discriminatory intent.

In sum, Sattar has not pointed to evidence that "reasonably supports a finding of prohibited discrimination."  James, 233 F.3d at 154.  Accordingly, the Government is entitled to summary judgment on the claim that Sattar was discriminated against with respect to his non-selection for the Budget Analyst position.

IV.     HOSTILE WORK ENVIRONMENT CLAIM

        A.     Applicable Law

A hostile work environment claim requires the plaintiff to show "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer."  Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)); accord Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015).

The Second Circuit has summarized the governing law as follows:

To establish a hostile work environment under Title VII, § 1981, or § 1983, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993) (citations and internal quotation marks omitted).  "This standard has both objective and subjective components: the conduct complained

> of must be severe or pervasive enough that a reasonable person would find it
> hostile or abusive, and the victim must subjectively perceive the work
> environment to be abusive." Raspardo, 770 F.3d at 114 (citing Harris, 510 U.S. at
> 21-22, 114 S. Ct. 367). "The incidents complained of must be more than
> episodic; they must be sufficiently continuous and concerted in order to be
> deemed pervasive." Id. (internal quotation marks omitted). In determining
> whether a plaintiff suffered a hostile work environment, we must consider the
> totality of the circumstances, including "the frequency of the discriminatory
> conduct; its severity; whether it is physically threatening or humiliating, or a mere
> offensive utterance; and whether it unreasonably interferes with an employee's
> work performance." Harris, 510 U.S. at 23, 114 S. Ct. 367.

Littlejohn v. City of New York, 795 F.3d 297, 320-21 (2d Cir. 2015). "The same standards

apply to hostile work environment claims brought under the ADEA." Terry, 336 F.3d at 148

(citation omitted). To satisfy this standard, a plaintiff "must demonstrate either that a single

incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and

concerted to have altered the conditions of [plaintiff's] working environment." Whidbee v.

Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000) (quoting Cruz v. Coach Stores,

Inc., 202 F.3d 560, 570 (2d Cir. 2000)).

B.    Discussion

Sattar claims that he was subjected by his supervisors to a hostile work environment that

was "permeated with discriminatory treatment from at least 1993." Pl. Mem. at 31. He points to

several specific instances of comments and conduct to support this assertion: (1) in or around

1993, Ulianko asked Sattar "Are those terrorists your cousins?" in reference to recent terrorist

attacks and on another occasion referenced Sattar being a Muslim, see Pl. Sattar Dep. at 54-55,

78, 80; (2) on September 12, 1997, Natale pretended to shoot Sattar with an imaginary rifle

while making a "bang" sound; see id. at 75; Affidavit of John Walter Natale, dated June 24,

1998, annexed as Ex. 8 to Gastman Decl., at 2; (3) once in 2004 and once in 2006, Ulianko told

Sattar, "You're too old," see Pl. Sattar Dep. at 186; Gov't Sattar Dep. at 347-48; (4) Ulianko

discovered that Sattar had been going into the men's room, kneeling down, and praying, and he transferred Sattar to a "dead-end position" allegedly because of this, Ulianko Aff. at Plaintiff002077; and (5) Sattar was denied promotions in accordance with McRimmon's alleged practices of not promoting men, Muslims, and individuals over 60 who do budgeting work, see Pl. Mem. at 31.[11]   Sattar also notes that Waskiewicz stated that she witnessed "many examples of comments made about his religion and age."   Waskiewicz Aff. at US_00097-98.   But it seems that the comments Waskiewicz refers to occurred outside of Sattar's presence, see id., and therefore Sattar could not have "subjectively perceive[d]" the work environment to be hostile on this basis.   Littlejohn, 2015 WL 4604250, at *16 (citation omitted).

The Government argues that most of the cited incidents were resolved by the 2006 settlement agreement that Satter and DHS entered into with respect to a prior EEO complaint that Sattar filed.   See Gov't Mem. at 30; see also Amendment to Complaint, annexed as Ex. P to Folch Decl. at Plaintiff002514-16 (amending Sattar's 2005 EEO complaint to include, inter alia, allegations that Ulianko discovered Sattar had been going into the men's room, kneeling down in a stall, and praying and that Sattar was subsequently placed in a "dead end position," that emails critical of Muslims had been circulated around the FPS office, and that a manager crept up behind Sattar and shouted "bang").   The settlement agreement provided Sattar could never again institute litigation "concerning the subject matter raised in the complaints."   See Settlement Agreement at US_00418-19.   Sattar never addresses this argument.

---

[11]   In the Amended Complaint, Sattar also alleges that "[d]erogatory and anti-Muslim emails were circulated around the office and directed at Plaintiff by Plaintiff's co-workers causing a hostile work environment."   Am. Compl. ¶ 61.   However, he does not raise this argument in his memorandum in opposition to the Government's motion for summary judgment, and he has offered no evidence to support this allegation.

Even setting aside the potential preclusive effect of that settlement agreement and viewing the facts in the light most favorable to Sattar, the admissible evidence before us would still not allow a reasonable factfinder to conclude that the alleged "harassment was sufficiently severe or pervasive to alter the conditions of [Sattar's] employment and create an abusive working environment." Alfano, 294 F.3d at 373 (citation omitted). First, as to the incident where Ulianko discovered that Sattar had been praying in the men's room, the evidence provided only indicates that Ulianko offered to find Sattar a "more appropriate" place to do this if he wished, Ulianko Aff. at Plaintiff002077, and only speculation supports the inference that Sattar's transfer to the Program Technician position was a result of this discovery. Indeed, Sattar does not specifically address this incident in his memorandum of law or anywhere other than the amended complaint, and the only evidence about the reason for this transfer is entirely benign. See id. (explaining that Sattar had received training courses meant to "enhance his qualifications and elevate his chances for success" and that he was only transferred to the Program Technician position after he had done "a terrible job" as a Control Desk Operator). As to the other instances identified by Sattar, while they involve comments or jokes which may have been offensive or in poor taste, none of these incidents alone is "extraordinarily severe" enough to create a hostile work environment. Whidbee, 223 F.3d at 69 (citation omitted); see Fitzgerald v. Henderson, 251 F.3d 345, 356-57 (2d Cir. 2001) ("Title VII does not authorize a hostile work environment claim for conduct that was merely offensive, rather than sufficiently severe or pervasive . . . .") (internal quotation marks and citation omitted). Neither can it be said that, viewing all of the instances together, "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered." Alfano, 294 F.3d at 373 (citations omitted). The specific incidents cited by Sattar, which

occurred intermittently over a period of approximately 13 years, are merely "episodic," rather than "continuous and concerted."  Id. at 374 (quoting Perry, 115 F.3d at 149).  There is thus no evidence that would allow a reasonable jury to find there was a hostile work environment.  See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, . . . meaning that instead of sporatic racial slurs, there must be a steady barrage of opprobrious racial comments.") (internal citations, quotation marks, and alteration omitted).

As to Natale's pantomimed shooting of an imaginary gun at Sattar, this could not be reasonably perceived as "physically threatening or humiliating," and there is no evidence that this act or any other conduct "unreasonably interfer[ed] with" Sattar's performance at work. Harris, 510 U.S. at 23. Accordingly, we conclude that Sattar has not shown that there is a triable issue of fact as to the alleged hostile work environment, and the Government is entitled to summary judgment on this issue.

V.     RETALIATION CLAIM

A.     Applicable Law

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a).  Under this statute, an employer may not retaliate against an employee for complaining of employment discrimination prohibited by Title VII. Kessler v. Westchester Cty. Dep't of Soc. Servs., 461 F.3d 199, 205 (2d Cir. 2006).  Retaliation claims under the ADEA are analyzed by the same standards as those under Title VII.  Id.; Terry, 336 F.3d at 141; see also 29 U.S.C. § 623(d).

30

"To establish a prima facie case of retaliation a plaintiff must show (1) participation in a protected activity that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision." Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir. 1999) (citation omitted); accord Patane v. Clark, 508 F.3d 106, 115 (2d Cir. 2007) (citing Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004)).  Generally, a plaintiff may demonstrate the last element either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (citing Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)).

Unlike discrimination claims, the adverse employment action in a retaliation claim "need not affect the terms and conditions of a plaintiff s employment." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 n.6 (2d Cir. 2010).  However, the plaintiff must nonetheless show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." White, 548 U.S. at 68.  In assessing "material adversity, a court must separate significant from trivial harms." Id. (citation and internal quotation marks omitted).

Claims of retaliation are analyzed according to the same framework as disparate treatment claims.  See, e.g., Coffey v. Dobbs Int'l Servs., Inc., 170 F.3d 323, 326 (2d Cir. 1999). Thus, we again assume, arguendo, that Sattar has made out a prima facie case for retaliation.

31

Accordingly, we first consider whether the Government has offered a legitimate,

nondiscriminatory reason for its allegedly retaliatory actions, and then consider whether Sattar

has met his burden of showing retaliation.

      B.    <u>Discussion</u>

    Sattar identifies five actions by the Government that he claims establish a pattern of

retaliatory antagonism.  <u>See</u> Pl. Mem. at 25, 27.  He contends that the Government retaliated

against him for his EEO activity by: (1) not selecting him for the Budget Analyst position, (2)

denying his request to telework in March 2012, (3) lowering his performance grade and

monetary awards in October 2012, (4) denying him overtime in March 2013, and (5) excluding

him from a relevant meeting in May 2013.  <u>See</u> <u>id.</u> at 25.  As stated in section 1.A above, Sattar

has not identified admissible evidence showing that his performance grade was lowered or that

he received a reduced monetary award in 2012.  We therefore do not consider the third alleged

instance of retaliation.  As to the first instance, as discussed in section III.B., the Government has

offered evidence that Sattar was not selected for the Budget Analyst position because another

candidate, Smith, was more qualified; and Sattar has not offered evidence sufficient to show that

this reason was mere pretext.  Just as none of the evidence points to a protected characteristic as

a motive for Sattar's non-selection, the evidence equally fails to point to retaliation as a motive.

    As to Sattar's telework request, the Government contends that McRimmon initially

denied the request because there was no such policy available in this regional office of FPS.  <u>See</u>

Gov't Mem. at 11 (citing Ex. X to Folch Decl. at US_00001-02); <u>see also</u> Gov't McRimmon

Dep. at 184-85.  Sattar has offered evidence indicating that there was such a policy in place at

the time of his request.  <u>See</u> Pl. Bamba Dep. at 103; Ulianko Dep. at 25-26, 125-26.  Accepting

Sattar's version of the facts and assuming there was such a policy in place, we nonetheless

cannot conclude that this shows that McRimmon's initial denial of Sattar's telework request was pretextual or retaliatory. Sattar has not offered any evidence or argument that McRimmon's initial denial was in any way connected to his EEO activity — merely that it did not comply with the procedures in place at FPS for telework. <u>See</u> Pl. Mem. at 8. Given that Sattar's request was granted once the disability section of DHS recommended it, <u>see</u> Gov't McRimmon Dep. at 184-86, and that McRimmon approved the renewal of Sattar's telework arrangement at the recommendation of the Disability Employment Program Manager a year later, <u>see</u> Ex. Y to Folch Decl. at Plaintiff000008, a jury would have almost no basis to find the initial denial of Sattar's telework request was retaliatory.

As to Sattar's March 2013 request for five hours of overtime, the Government argues that it was initially denied because FPS policy requires employees to seek prior approval to work overtime, which Sattar did not do. <u>See</u> Gov't Mem. at 9-10. Sattar's deposition testimony on this point is somewhat contradictory, <u>see</u> Gov't Sattar Dep. at 307-10, but even accepting his version of facts that he did submit a prior request to McRimmon, this does not show that the denial was retaliatory. Moreover, Sattar was ultimately paid for the hours and he has not offered any explanation of how or why a "reasonable employee would have found" the events relating to the overtime to be "materially adverse." <u>White</u>, 548 U.S. at 68.

Finally, as to McRimmon excluding Sattar from a meeting in May 2013, the evidence indicates that Sattar was excluded because the subject matter was not relevant to him. <u>See</u> Pl. McRimmon Dep. at 202; Gov't Bamba Dep. at 126. The evidence identified by Sattar, <u>see</u> Pl. 56.1 Stmt. ¶¶ 187-92, does nothing to contradict this. <u>See</u> Ex. 16 to Gastman Decl. at Plaintiff000015 (Bamba stated that Sattar was excluded from a finance meeting because "Mr. McRimmon restricted the meeting to a few individuals"); Pl. Bamba Dep. at 104-06

(McRimmon told Bamba Sattar was excluded from certain meetings because the subject matter was not relevant or he wanted to keep the meetings small); Pl. McRimmon Dep. at 202 (Sattar would not be included in a budget meeting about "higher level work").  And Sattar's assertion that other FPS employees who were less involved with budgeting than he were included in the meeting, see Pl. Mem. at 29, is unsupported by any citation to relevant evidence.  Thus, Sattar has not made a showing that his exclusion from the May 2013 meeting was retaliatory.

Sattar notes that the denial of his telework request, denial of overtime, and exclusion from meetings all occurred within months of his filing the complaint or amended complaint in this action.  See Pl. Mem. at 26-27.  While this circumstantial evidence may be useful to establish a prima facie case of retaliation, it does not rebut the legitimate, non-retaliatory reasons offered by the Government.  See El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (per curiam) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext.") (citations omitted); Reilly v. Metro-N. Commuter R.R. Co., 1996 WL 665620, at *14 (S.D.N.Y. Nov. 15, 1996).  Additionally, Sattar had a long history of filing EEO complaints during his time at FPS, see Gov't 56.1 Stmt. ¶¶ C.64-70; Pl. 56.1 Stmt. ¶¶ C.64-70; Pl. Mem. at 24; Am. Compl. ¶ 63; Formal Complaint of Discrimination, annexed as Ex. 9 to Gastman Decl. (EEO complaint dated October 28, 1997), which McRimmon and Ulianko were allegedly aware of, see Am. Compl. ¶¶ 29-30, Pl. Sattar Dep. at 186, but there is no evidence that McRimmon and other FPS officials ever took retaliatory action against him for that previous activity.

Sattar also points to the email sent by McGowan to Ulianko and McRimmon, in which

McGowan wrote that Sattar was engaged in "veiled saber rattling" with respect to a possible EEO complaint and was "starting in again," Ex. 11 to Gastman Decl., as "direct evidence" of the motivation behind the alleged retaliatory actions, Pl. Mem. at 27.  This email does indicate that FPS personnel were aware of Sattar's frequent EEO activity and the possibility that he might file another complaint, and it implies that McGowan at least did not believe Sattar's EEO complaints were credible.  But it does not suggest that any retaliatory action was contemplated.  It merely acknowledges that Sattar had mentioned filing an EEO complaint, without suggesting any steps that should be taken to respond or to discourage Sattar.  Moreover, it was sent by McGowan, who is not alleged to be involved with the instances of retaliatory action, and there is no evidence that Ulianko or McRimmon shared McGowan's skepticism as to Sattar's EEO activity, or even that they responded to the email at all.  And although the email was sent only months before Sattar's non-selection for the Budget Analyst position, it was sent years before the other alleged instances of retaliation, which occurred between 2012 and 2013.  See Ex. 11 to Gastman Decl. (McGowan's email was dated December 24, 2008).  Thus, this email does not sufficiently establish that the instances were the result of discrimination or retaliation based on Sattar's EEO activity in the face of the Government's proffered legitimate, nondiscriminatory reasons for the action.[12]

   Finally, Sattar points to evidence that Ulianko asked Sattar, "Why do you go to EEO, why don't you come to me?"  See Pl. 56.1 Stmt. ¶¶ 106, 108 (citing Pl. Sattar Dep. at 186).

---

[12] Sattar also claims that McRimmon made certain statements about his EEO activity in February 2010 that demonstrate a retaliatory motive.  See Pl. Mem. at 27.  However, as noted above, the only evidence offered to support this allegation is Sattar's attorney's unsworn response to one of the Government's interrogatories, which does not meet the requirements of Fed. R. Civ. P. 33(b)(3) or 56(c)(4) and is therefore inadmissible.

Sattar does not address this evidence in his memorandum of law, let alone offer an explanation of how these statements were "materially adverse." White, 548 U.S. at 68. Thus, these comments have not been shown to constitute retaliation for Sattar's EEO activities.

VI.   <u>CONCLUSION</u>

For the reasons stated above, the Government's motion for summary judgment dismissing the complaint (Docket ## 38, 42) is granted in its entirety. The Clerk is requested to enter judgment.

SO ORDERED.

Dated: September 11, 2015
       New York, New York


_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge